## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JOHN BENTON RICH II,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-CV-0624-JED-JFJ** |
| | ) | |
| **HARLAN MOORE,** | ) | |
| **CHANCE WYNN,** | ) | |
| **NIC KARLESKINT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

John Benton Rich, II, brings this civil rights action, under 42 U.S.C. § 1983, to vindicate the alleged violations of his Fourteenth Amendment right to due process. He claims that while he was held as a pretrial detainee in the Delaware County Jail, in Jay, Oklahoma, three defendants—Delaware County Sheriff Harlan Moore, Delaware County Jail Administrator Chance Wynn, and Delaware County Detention Officer Nic Karleskint—intentionally deprived him of adequate shelter, clothing and medical care after he complained about "deplorable living conditions" and engaged in a physical altercation with Karleskint. Before the Court are Moore's motion for summary judgment (Doc. 44) and Wynn's and Karleskint's joint motion for summary judgment (Doc. 45). Rich did not file a response to either motion. Also before the Court are Defendants' joint motion for confession of judgment (Doc. 48), Rich's motion to stay (Doc. 51), and Rich's motion for extension of time (Doc. 54).

For the reasons that follow, the Court denies Rich's motion to stay and motion for extension of time, denies Defendants' motion for confession of judgment, and grants Defendants' motions for summary judgment.

I.      **Preliminary matters**

Before deciding Defendants' motions for summary judgment, or identifying the facts that should be considered part of the summary judgment record, the Court must first address Rich's motions to stay the summary judgment proceeding and permit him additional time to respond to the motions for summary judgment and Defendants' motion for confession of judgment.

A.      **Rich's motion to stay and motion for extension of time (Docs. 51, 54)**

In his motion to stay (Doc. 51) and motion for extension of time (Doc. 54), Rich seeks additional time to respond to Defendants' motions for summary judgment.  In both motions, Rich alleges he has not been able to respond to the motions for summary judgment or the motion for confession of judgment due to his lack of access to the law library, the ongoing coronavirus pandemic, his placement in segregation and one or more transfers between prison facilities.  In both motions, Rich also renews his request for appointment of counsel.

In an opinion and order (Doc. 53) filed September 28, 2020, the Court considered the same circumstances Rich cites in his instant motions and determined that those circumstances did not support Rich's requests for additional time to respond to Defendants' motions or his requests for appointment of counsel.  For the same reasons stated in the September 28, 2020 opinion and order, the Court therefore denies Rich's motion to stay (Doc. 51) and his motion for extension of time (Doc. 54).

B.      **Motion for confession of judgment (Doc. 48)**

Citing Rich's failure to respond to their motions for summary judgment, Defendants move the Court to deem confessed their motions for summary judgment, deem admitted all material facts set forth in their motions, and grant summary judgment in their favor.  Doc. 48, Mot. for Confession of J., at 1-3.

Under this Court's local rules of civil procedure, "[i]f a dispositive motion is not opposed, the Court may either (1) provide an additional fourteen (14) days, after which the case will be dismissed or the motion will be deemed confessed, as appropriate, or, (2) in the event the moving party has filed a motion for confession of judgment, such motion may be granted following fourteen (14) days after filing."  LCvR 7.2(f).  Further, under LCvR 56.1(c), "[a]ll material facts set forth in the statement of facts of [the party moving for summary judgment] shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party."  This latter rule is largely consistent with Fed. R. Civ. P. 56(e)(2), but the local rule uses "shall" whereas the federal rule provides that a court "may" consider the movant's assertion of fact as undisputed for purposes of summary judgment if the nonmovant fails to properly address the movant's assertion of fact as required by Rule 56(c).

As previously stated, Rich did not file a response to either motion for summary judgment, and more than 14 days have passed since Defendants filed their motion for confession of judgment. The Court therefore has discretion to deem confessed both motions for summary judgment, *see* LCvR. 7.2(f), and to consider Defendants' factual assertions undisputed for purposes of summary judgment to the extent Rich has not properly addressed them or specifically controverted them, *see* Fed. R. Civ. P. 56(e)(2); LCvR 56.1(c).  However, for two reasons, the Court denies Defendants' motion for confession of judgment.

First, as just discussed, the Court has determined that the circumstances surrounding Rich's failure to respond to the summary judgment motions are not sufficient to demonstrate the requisite "excusable neglect," under Fed. R. Civ. P. 6(b)(1)(B), to enlarge the time to respond and the Court has denied his requests for counsel.  *See* Doc. 53, Order, at 3-8.  But the Court is not unsympathetic to Rich's alleged difficulties in prosecuting this action from prison without counsel when, in light

3

of the coronavirus pandemic, he likely confronts even more restrictions on his movements within the prison than would be expected under normal prison conditions. While the Court has denied Rich's requests for additional time to respond, the Court declines to deem admitted all material facts in the Defendants' motions for summary judgment.

Second, while Rich did not file timely responses to the motions for summary judgment, he has submitted factual assertions that should be included in the summary judgment record. Specifically, Rich's initial, verified complaint contains detailed factual allegations in support of his Fourteenth Amendment claim, *see* Doc. 1, Compl., generally, and he submitted an unsworn "affidavit," signed under penalty of perjury, with his supporting brief wherein he avers "[t]hat all facts set forth in the claim are accurate to the best of [his] knowledge," Doc. 2, Pl's Br., at 13. Under Fed. R. Civ. P. 56(c)(4), a court may consider affidavits and declarations in summary judgment proceedings. And, particularly where a litigant appears *pro se*, "[a] district court may treat a verified complaint 'as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56[(c)(4)].'" *Lantec, Inc., v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002) (quoting *Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988)). Under Rule 56(c)(4), an affidavit or declaration must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(c)(4). Moreover, a court may consider statements from an unsworn declaration if the declaration is signed under penalty of perjury as required by 28 U.S.C. § 1746; *see also Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (holding that a *pro se* plaintiff may submit, and a court must consider, as evidence factual contentions contained in a motion or other pleading when the contentions are based on personal knowledge, would be admissible into evidence, and where the plaintiff has attested that the contentions are true and

correct under a penalty of perjury).  That said, "a district court need not treat a verified complaint as an affidavit if 'the allegations contained in the pleading are merely conclusory.'" *Lantec, Inc.*, 306 F.3d at 1019 (quoting *Conaway*, 853 F.2d at 793).  And, under this Court's local rules, "[f]actual statements or documents appearing only in [a] brief shall not be deemed to be part of the record in the case, unless specifically permitted by the Court."  LCvR 7.2(j).

Applying these rules under the particular circumstances of this case, and in the interest of ensuring a fair summary judgment proceeding, the Court will treat Rich's verified complaint as an affidavit and will treat his unsworn "affidavit" as a declaration, to the extent the statements therein satisfy Rule 56(c)(4)'s requirements.  However, the Court will disregard any conclusory or unsubstantiated allegations in the affidavit or declaration and will not consider as part of the summary judgment record any factual statements that are asserted only within Rich's supporting brief.

## II.    Findings of fact

The following facts are either undisputed or viewed in the light most favorable to Rich. Rich was booked into the Delaware County Jail ("Jail") on February 9, 2017, on a charge of first-degree robbery.  Doc. 44-1, Defs.' Ex. 1, at 1-2.[1]  During the time relevant to this action, the Jail's relevant written polices:

- Required the Jail to provide inmates with clean bedding, institutional clothing, personal hygiene supplies, daily access to showers, toilets and hand-washing sinks, Doc. 44-11, Defs.' Ex. 11, at 1-2; Doc. 44-12, Defs.' Ex. 12, at 1-3;

---

[1] For consistency, the Court's record citations refer to the CM/ECF header page number in the upper right-hand corner of each document.  Because the exhibits attached to Moore's motion for summary judgment are identical to the exhibits attached to the joint motion for summary judgment filed by Wynn and Karleskint, the Court refers to Moore's exhibits as Defendants' exhibits and provides a record cite only for the exhibits attached to Moore's motion.

- Required the Jail to perform daily inspections of all areas to maintain sanitary conditions and maintain inspection records, prohibited the use of curtains, cardboard or other screening materials to block windows or bars on jail cells,  required inmates to maintain the cleanliness of their cells, and permitted jail staff to issue cleaning equipment and supplies to inmates on a daily basis, Doc. 44-13, Defs.' Ex. 13, at 1-3;

- Required the Jail to provide inmates with clean and pest-free living conditions by performing regular inspections and proving extermination services as needed, Doc. 44-14, Defs.' Ex. 14, at 1-2;

- Permitted disciplinary sanctions, including segregation from general population, for minor and major infractions but generally prohibited punishing an inmate by depriving the inmate of clothing, bedding, or necessary personal hygiene items, Doc. 44-15, Defs.' Ex. 15, at 1-6;

- Prohibited the use of excessive force but permitted the use of reasonable force to protect human life, maintain security and ensure compliance with lawful orders, Doc. 44-16, Defs.' Ex. 16, at 1-12; Doc. 44-17, Defs.' Ex 17, at 1-4; Doc. 44-18, Defs.' Ex. 18, at 1-8; and

- Required the Jail to provide inmates with access to routine and emergency medical care by qualified medical personnel as needed, provided procedures for inmates to submit written requests for routine medical services, and provided procedures for the storage and directed administration of inmates' prescription medications, Doc. 44-19, Defs.' Ex. 19, at 1; Doc. 44-20, Defs.' Ex. 20, at 1-5; Doc. 44-21, Defs.' Ex. 21, at 1-2.

On March 23, 2017, Rich was housed in a jail cell (cell # 7) with four other inmates: Charles Neff, Tyler Beamer, Dennis Peggram and Christopher Polhamus.  Doc. 1, Compl., at 3; Doc. 44-2, Defs.' Ex. 2, at 16.   Around 11:45 p.m., Rich, or one or one of his cellmates, contacted

the Jail's command center through an intercom, requesting a mop to clean up water from a toilet overflow in their cell.  Doc. 1, Compl., at 3; Doc. 44-2, Defs.' Ex. 2, at 12.  The three detention officers on duty, Clay Luper, Whitney Reynolds, and Defendant Nic Karleskint were, respectively, fingerprinting an incoming inmate, filing warrants, and transporting a trustee to a storage room.  *Id.*  Reynolds, a female detention officer who was restricted to the Jail's command center, told the inmates in cell # 7 that "it would be a minute" before one of the male officers could respond to the cell.  Dkt. 44-2, Defs.' Ex. 2, at 12, 16.

While Luper continued fingerprinting the incoming inmate, one or more of the inmates from cell # 7 began yelling obscenities at Luper and kicking the cell door.  *Id.* at 12, 16.  Luper opened the main door to the A-pod, where cell # 7 was located, and yelled across the pod, and told the inmates to stop kicking the door.  *Id.* at 16.  One of the inmates called Luper "a fat son of a bitch."  *Id.*  In response, Luper told the inmates in cell # 7 that they would be locked down for 24 hours as a sanction for disrespecting staff.  *Id.*

Karleskint heard inmates in the A-pod kicking a cell door as he returned from the storage room with the trustee.  Doc. 44-2, Defs.' Ex. 2, at 13.  When Karleskint approached the booking area, he heard Luper tell the inmates in cell # 7 to stop kicking the door, and the inmates complied.  *Id.*  Luper told Karleskint that the inmates would be on a 24-hour lock down for disrespecting staff and that the inmates had called Luper "a fat piece of shit."  *Id.*  Karleskint spoke to the inmates in cell # 7 over the intercom, and Rich told Karleskint that he needed a mop to clean the cell floor because the toilet water overflowed "from [the inmates] snaking their toilet."  *Id.*  When Luper finished fingerprinting the incoming inmate, Karleskint opened the door to cell # 7, allowed the inmates to retrieve a mop, and allowed Rich to shower.  *Id.*  After the inmates finished cleaning the cell, Karleskint told them to lock down and they complied.  *Id.*  After Rich shut the cell door,

he asked Karleskint if he and his cellmates would still be subject to the 24-hour lock down.  Doc. 44-2, Defs.' Ex. 2, at 13.  Karleskint said that would be Luper's decision.  *Id.*

When Luper later confirmed, through the intercom, that the inmates in cell # 7 would be on 24-hour lock down, Rich told Luper and Karleskint that he was going to "turn up" the Jail and told them to open the cell door so he could demonstrate the meaning of "turn up."  Doc. 44-2, Defs.' Ex. 2, at 13.  Over the intercom, Karleskint encouraged Rich to calm down.  *Id.*  Rich initially denied calling Luper names but then admitted he called Luper names and kicked his cell door.  *Id.*  When Rich continued to ignore Karleskint's advice to "chill out," Karleskint and Luper decided to speak to Rich in person.  *Id.*  Karleskint told Reynolds, who remained in the command center, to open the cell door when he and Luper arrived at cell # 7.  *Id.*  Karleskint and Luper then walked through the pod to cell # 7.  *Id.*

As Luper and Karleskint waited for the cell door to open, Karleskint drew his X2 Taser.  Doc. 44-2, Defs.' Ex. 2, at 14.  When the door opened, Karleskint saw Rich standing toward the back of the cell with an angry look on his face and his arms crossed.  *Id.*; Doc. 44-3, Defs.' Ex. 3, at 5.  Karleskint pointed his Taser at Rich, Doc. 1, Compl., at 3, but then holstered the Taser and tried to reason with Rich, urging him to "let it go," Doc. 44-2, Defs.' Ex. 2, at 14.  Using crude terms, Rich said he would do so only if the officers would take him off the 24-hour lock down.  Doc. 44-2, Defs.' Ex. 2, at 14.  Karleskint then tried to grab Rich and remove him from the cell,

and a physical altercation ensued.  Doc. 1, Compl., at 3; Doc. 44-2, Defs.' Ex. 2, at 14, 16.[2]  Rich

punched Karleskint in the face, and Karleskint tackled Rich.  Doc. 44-2, Defs.' Ex. 2, at 14; Doc.

44-3, Defs.' Ex. 3, at 5.  Luper, who initially stood outside the cell door, attempted to assist

Karleskint, but Rich's cellmate, Charles Neff "jumped on" Luper and began punching Luper in

the head.  Doc. 44-2, Defs.' Ex. 2, at 14, 17.  As he continued wrestling with Rich, Karleskint

turned and saw Neff straddling Luper and striking Luper in the face.  *Id.*  Karleskint got up, shoved

Rich to the back of the cell, and reached for his Taser to assist Luper.  *Id.*  At that point, Karleskint

realized that Rich had the Taser in his hand.  Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex.

3, at 3.  Rich pointed the Taser at Karleskint and threatened to shoot him in the face.  Doc. 44-2,

Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex. 3, at 3.  As Rich and Karleskint fought for control of the

Taser, a third inmate from cell # 7, Tyler Beamer, stepped in, grabbed the Taser from Rich, and

returned the Taser to Karleskint.  Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex. 3, at 3.  At

that point, Neff was no longer fighting with Luper.  Doc. 44-2, Defs.' Ex. 2, at 14.  Karleskint

holstered the Taser and saw that Luper "had blood all over his face."  *Id.*  Karleskint escorted Rich

and Neff to the booking area, handcuffed Rich to a restraint chair, and handcuffed Neff to the wall.

*Id.*

When the scuffle in cell # 7 began, Reynolds called for law enforcement assistance,

reported that two detention officers were being attacked by inmates, and called Defendant Chance

---

[2] Defendants' Exhibit 2, the jail incident report, indicates that the altercation was captured on video and an officer who investigated the incident viewed the video, but Defendants did not submit a copy of the video to the Court.  Doc. 44-2, Defs.' Ex. 2, at 14.  Regardless, as further discussed in the analysis section, Rich does dispute that the altercation occurred and his complaint does not clearly assert an excessive-force claim.  However, the Court includes facts about the altercation because Rich appears to contend that the altercation led to the claimed deprivation of his rights to adequate shelter, clothing, and medical care and because Rich's assertion that Karleskint "physically assaulted" him, *see* Doc. 2, Pl.'s Br., at 13, could be generously construed as attempting to assert an excessive-force claim against Karleskint.

Wynn, the Jail Administrator.  Doc. 44-2, Defs.' Ex. 2, at 14, 17.  Local law enforcement officers arrived as Karleskint was escorting Rich and Neff to the booking area, and Wynn arrived shortly thereafter.  *Id.* at 14.  After he ensured that the jail was secure, Wynn took Luper to the local emergency room where Luper was treated for bruising on his head and diagnosed with a broken collarbone.  Doc. 44-2, Defs.' Ex. 2, at 14, 18.

After the altercation, Rich and Neff were placed in cell # 11, a holding cell, and kept separate from general population.  Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 1, Compl., at 3.  According to Rich, he "spen[t] the next 41 days in absolute hell."  Doc. 1, Compl. at 3.

Rich and Neff were stripped to their boxers before being placed in a one-man jail cell that was "freezing" and, for two weeks, jail staff refused to provide them with mats, blankets, "hygiene products, showers, phone calls, mail, writing supplies, contact with visitors, or any other basic human needs."  Doc. 1, Compl., at 3.  The cell "had no lighting whatsoever and staff would cover the window on the door any time [Rich] would ask for anything."  *Id.*  The cell also was "permeated with the stench of feces that had been smeared on the ceiling by the previous inhabitants."  Doc. 1, Compl., at 4.  When Rich asked what he should use to clean himself after using the toilet, two detention officers, Cody Thompson and Tyler Houston, told him to "[f]igure that shit out."  *Id.* "[J]ail staff" also refused to clean the feces from the cell, denied Rich's "daily" requests to speak with Defendant Sheriff Harlan Moore, and prohibited Rich from filing formal grievances or

contacting his attorney.  Doc. 1, Compl., at 4.  When Rich received food, it was served on a napkin.[3]
*Id.*

On April 7, 2017, "jail staff" moved Rich and Neff to a one-man cell with a shower.  Doc.
1, Compl., at 4.  According to Rich, "the shower drain was infested with shower flies," and the
flies "would crawl all over [him] day and night."  *Id.*  For about one week, Rich's pleas for help
were "met with uncaring and indifference by staff."  *Id.*  On "Day 21," which appears to refer to
April 14, 2017, Rich was provided "a mat, toothpaste, soap, and toilet paper."  Doc. 1, Compl., at
4.  Rich used the mat to cover the shower drain and "slow[] the rate at which the insects could
infest his cell," but Rich then had to sleep on a wet mat and "shiver himself to sleep at night" in
the cold.  *Id.*

Also on April 14, 2017, Rich "noticed that he had contracted some type of infection under
his right arm pit."  *Id.*  According to Rich, he "pleaded with staff to give him medical attention for
the next week."  Doc. 1, Compl., at 4.  Rich submitted an Inmate Medical Request Form on April
17, 2017, seeking medical attention for "a lump the size of a golf ball in [his] right arm pit" and a
sinus infection.  Doc. 44-7, Defs.' Ex. 7, at 1.  On what Rich describes as "day 26," which appears
to be April 19, 2017, "the wound ruptured and Staph began leaking down his side and seeping into
his bedding" but "[s]taff still refused to wash his bedding or render medical aid for another 3 days
(day 29)."  *Id.*  Rich became physically ill and had to be "rushed to the private office of the jail

---

[3] In his complaint, Rich alleges that "a sign was posted" at the booking desk indicating that
"nothing was to go in or out of the cell, that the door was not to be opened, and unless food was
on a napkin, [Rich and Neff] weren't allowed to have it."  Doc. 1, Compl., at 4.  Given Rich's
allegations that he was held in isolation for at least two weeks in a cold, dark cell with little or no
view out of his cell window, Doc. 1, Compl., at 3-4, the Court finds that Rich would not have
personal knowledge of the content of a sign posted at the booking desk.  The Court therefore
disregards that portion of his factual assertion.  The Court finds, however, that Rich would know
if his food was served on a napkin.

doctor (Integras center)."  Doc. 1, Compl., at 4-5.

According to the medical records from Integris Grove Express Care, in Grove, Oklahoma, Rich was examined by a medical professional on April 18, 2017.  Doc. 44-8, Defs.' Ex. 8, at 1. Rich was diagnosed with an "abscess," and the abscess was incised, drained and filled with packing.  Doc. 44-7, Defs.' Ex. 7, at 1; Doc. 44-8, Defs.' Ex. 8, at 1-3.  Rich was prescribed antibiotics and returned to the Jail with instructions to remove one inch of packing in 24 hours, remove the remaining packing on the following Thursday, take the medication as prescribed, and keep the area clean and covered.  Doc. 44-8, Defs.' Ex. 8, at 2-3.  As directed, jail staff removed part of the packing on April 19, 2017, and the remainder of the packing on April 20, 2017.  Doc. 44-7, Defs.' Ex. 7, at 1.  After Rich returned to the jail, his medications were administered as prescribed.  Doc. 44-9, Defs.' Ex. 9, at 1-6.

According to Rich, after the "staph infection was cut from his body" he was returned to the same jail cell where he was again "refused hygiene products, toilet paper, phone calls, mail, writing supplies, contact with visitors, or attorney visits" until May 3, 2017, when he went to court.  Doc. 1, Compl., at 5.  The next day, May 4, 2017, Rich and Neff were moved to a two-man cell in the "normal housing unit" and, according to Rich, "all amenities were returned" to them.  *Id.*

Based on the above-described events, Rich claims that Delaware County Sheriff Harlan Moore, Delaware County Jail Administrator Chance Wynn, and Detention Officer Nic Karleskint violated his Fourteenth Amendment due process rights.  Doc. 1, Compl., at 1-2.  He purports to sue each defendant in his individual capacity and seeks nominal and punitive damages from each defendant.  *Id.* at 6.  In the complaint, Rich generally identifies his cause of action as a Fourteenth Amendment due-process claim.  Doc. 1, Compl., at 2.  In his supporting brief, he identifies seven "sub-claims" under the umbrella of his Fourteenth Amendment claim.  Doc. 2, Pl.'s Br., at 6-11.

12

Specifically, he claims Defendants were deliberately indifferent to his needs for adequate (1) temperature (heating), (2) bedding, (3) clothing, (4) lighting, (5) hygiene supplies and showers, (6) ventilation, and (7) medical care.  Doc. 2, Pl.'s Br., at 6-11.  Rich does not identify a separate "sub-claim" for excessive force, but he declares, under penalty of perjury, that Karleskint "physically assaulted" him "in retaliation for complaining about conditions."  *Id.* at 13.

On January 17, 2020, Sheriff Moore filed a motion for summary judgment (Doc. 44), and Wynn and Karleskint and filed a joint motion for summary judgment (Doc. 45).  Defendants contend they are entitled to judgment as a matter of law because the undisputed facts do not establish any constitutional violations.  Doc. 44, Moore Mot. for Summ. J., at 15-21; Doc. 45, Wynn & Karleskint Mot. for Summ. J., at 14-23.  Defendants further contend they are entitled to summary judgment on the basis of qualified immunity, to the extent Rich asserts claims against Defendants in their individual capacities, because the undisputed facts show they did not violate his clearly established constitutional rights.  Doc. 44, Moore Mot. for Summ. J., at 22-24; Doc. 45, Wynn & Karleskint Mot. for Summ. J., at 23-25.

## III.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  At the summary-judgment stage, the court's task "is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material when it "might affect the outcome of the suit under the governing [substantive] law."

*Anderson*, 477 U.S. at 248.  In determining whether summary judgment is appropriate, the court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the nonmoving party." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 997 (10th Cir. 2011)).  But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).  Consistent with the plain language of Rule 56(a), the movant bears the ultimate burden to show there are no genuine issues for the jury to resolve and that the movant is entitled to judgment as a matter of law.  *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1326 (10th Cir. 2009) (Holmes, J. concurring).

However, when a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears an initial burden to show, generally under the plaintiff's version of the facts, (1) that the defendant's conduct violated the plaintiff's constitutional right and (2) that the right in question was clearly established in the law, such that any reasonable official in the defendant's position would have known his or her particular conduct was unlawful.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152-53 (2018); *Thomson*, 584 F.3d at 1325 (Holmes, J., concurring). In deciding whether a defendant is entitled to summary judgment on the basis of qualified immunity, a court ordinarily adopts the plaintiff's version of the facts, to the extent that version of facts is grounded in, and not blatantly contradicted by, the summary judgment record.  *Thomson*, 584 F.3d at 1325-26.

## IV.    Analysis

To obtain relief under § 1983 for the alleged violation of his Fourteenth Amendment right

to due process, Rich must establish the general elements of any § 1983 claim, namely that (1) a "person" (2) acting under color of state law, (3) deprived [him] of, or caused another to deprive [him] of, (4) a right protected by the United States Constitution or other federal law. *Dodds v. Richardson*, 614 F.3d 1185, 1199-1200 (10th Cir. 2010); *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002). As to the fourth element, he must also establish the specific elements necessary to support the alleged constitutional violation.

Here, Rich purports to sue each defendant in his individual capacity, but the Court agrees with Sheriff Moore that the complaint could also be construed as attempting to sue Moore in his official capacity as the Delaware County Sheriff. Doc. 1, Compl., 6; Doc. 44, Moore Mot. for Summ. J., at 16. When a plaintiff sues a defendant in his or her individual capacity, the defendant "may be subject to personal liability and/or supervisory liability." *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). To demonstrate personal liability, the plaintiff must cite facts showing the defendant's "personal involvement in the alleged constitutional violation. *Id.* To "impose liability upon a defendant-supervisor," who did not personally participate in the alleged violation, the plaintiff must point to facts "show[ing] that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" *Brown*, 662 F.3d at 1164 (quoting *Dodds*, 614 F.3d at 1199).

To the extent Rich intends to sue Sheriff Moore in his official capacity, his suit is essentially a suit against Delaware County. *See Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) (explaining that an official-capacity suit is "essentially another way of pleading an action against the county or municipality [the official] represent[s]"). But a county "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty. v.*

15

*Brown*, 520 U.S. 397, 403 (1997).  Rather, a county may be liable only under a theory of municipal

liability.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  To state a municipal-liability

claim, or *Monell*, claim, Rich must identify facts demonstrating "(1) the existence of a municipal

policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or

custom was the moving force behind the constitutional deprivation."  *Sanders v. Glanz*, 138 F.

Supp. 3d 1248, 1254 (N.D. Okla. 2015).

Significantly, while "individual officers may receive the protection of qualified immunity,

'municipalities enjoy no such shield.'"  *Myers v. Okla. Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313,

1317 (10th Cir. 1998) (quoting *Watson v. City of Kansas City*, 857 F.2d 690, 697 (10th Cir. 1988)).

But, when the plaintiff is "suing a municipality under § 1983 for the actions of one of its officers"

and the plaintiff fails to establish that the officer violated the plaintiff's constitutional rights, the

"municipality cannot be liable under § 1983."  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 & n.8

(10th Cir. 2004).

### A.      Conditions-of-confinement claim

Six of Rich's seven "sub-claims" challenge the conditions of his confinement at the

Delaware County Jail.  Doc. 2, Pl.'s Br., at 6-10.  Under the Eighth Amendment, prison officials

"must provide humane conditions of confinement," i.e., the officials "must ensure that inmates

receive adequate . . . clothing, [and] shelter . . . and must 'take reasonable measures to guarantee

the safety of inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*,

468 U.S. 517, 526-27 (1984)).  The Fourteenth Amendment's Due Process clause likewise requires

jail officials to provide adequate clothing, shelter, and safety for pretrial detainees.  *See*, *e.g.*, *Perry

v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018) (noting that "[p]retrial detainees are protected

under the Due Process Clause rather than the Eighth Amendment" and further noting that courts

considering a pretrial detainee's complaints regarding conditions of confinement "apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983" (quoting *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999))); *Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) (noting that a constitutional violation occurs when jail officials "are deliberately indifferent to a pretrial detainee's serious medical needs" and addressing detainee's deliberate-indifference claim under Fourteenth Amendment). But no provision of the Constitution "'mandate[s] comfortable prisons,' and only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of [a constitutional] violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981)).

Thus, a pretrial detainee claiming that jail officials failed to provide constitutionally adequate clothing and shelter must show both (1) that the complained-of conditions are "'sufficiently serious' to implicate constitutional protection" and (2) that the jail official or officials responsible for those conditions acted with "'deliberate indifference'" to the inmate's health or safety. *DeSpain v. Uphoff*, 264 F.3d 965, 971 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). A sufficiently serious condition is one that "pos[es] a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834). To show deliberate indifference, the detainee must establish that the jail official "kn[ew] of and disregard[ed] an excessive risk to [the detainee's] health or safety." *Farmer*, 511 U.S. at 837. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation," does not violate the Constitution. *Id.* at 838.

Here, Rich's factual statements, drawn from his verified complaint, support that he was

17

exposed to conditions at the Delaware County Jail that may be "sufficiently serious" to implicate the Fourteenth Amendment.  Specifically, he states, under penalty of perjury, that he was stripped to his boxers and held for at least 14 days in a cell with no heating, no sleeping mat and no blankets. In addition, he was not allowed to shower or provided any hygiene supplies, his food was served to him on a napkin, and, in one cell, he endured shower flies crawling on him and the odor of feces smeared on the ceiling with little or no ventilation.  Doc. 1, Compl., at 3-4.  He further states that he was held in a cell with no light, save for the light from a small window that was covered up if he complained.  *Id*.  Viewing this evidence in Rich's favor, a reasonable jury could find that Rich has satisfied the objective component of his claim.  *See*, *e.g.*, *DeSpain*, 264 F.3d at 974-76 (discussing conditions of confinement sufficiently serious to implicate Eighth Amendment).

Nevertheless, even under Rich's version of the facts, the Court finds no constitutional violation.

### 1.    Individual-capacity claims

To the extent Rich sues each defendant in his individual capacity, there is no evidence showing that Sheriff Moore, Wynn or Karleskint personally participated in the alleged deprivation of Rich's Fourteenth Amendment right to adequate clothing and shelter, much less that each defendant acted with the deliberate indifference necessary to establish a Fourteenth Amendment violation.

As previously stated, to impose personal liability against any individual defendant, Rich must provide evidence showing that the defendant personally participated in the alleged Fourteenth Amendment violation or that the defendant can be held liable in his supervisory capacity.  *Brown*, 662 F.3d at 1163.  And, in either situation, Rich must show that each defendant, subjectively, knew of and disregarded an excessive risk to his health or safety.  *Farmer*, 511 U.S. at 837; *see Arocho*

*v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) (unpublished)[4] (stating that under Tenth

Circuit precedent, "[t]he traditional standard for supervisory liability . . . 'requires allegations of

personal direction or of actual knowledge and acquiescence' in a subordinate's unconstitutional

conduct" (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1400 (10th Cir. 1992))).

Each defendant submitted evidence showing that they neither participated in nor had

knowledge of any concerns regarding Rich's living conditions while he was detained at the Jail.

Wynn states that his contact with Rich was "extremely limited" and that he was "never notified"

of any concerns regarding Rich's conditions of confinement.  Doc. 44-4, Defs.' Ex. 4, at 1-3.

Karleskint similarly states that Rich never directly notified Karleskint of any concerns about his

living conditions and that he was not otherwise notified of such concerns.  Doc. 44-5, Defs.' Ex.

5, at 1-3.  Finally, Sheriff Moore states that he does not recall having any contact with Rich and

that he was never notified of any concerns regarding Rich's living conditions.  Doc. 44-6, Defs.'

Ex. 6, at 1-3.

Rich's version of the facts is entirely consistent with the Defendants' evidence.  In his

complaint, Rich asserts specific facts supporting that Karleskint and Luper (a non-defendant) were

personally involved in the physical altercation that took place in cell # 7 on March 23, 2017.  Doc.

1, Compl., at 3.  And other facts in the record support that Karleskint handcuffed Rich to a restraint

chair immediately after the altercation.  Doc. 44-2, Defs.' Ex. 2, at 14.  But throughout the

remainder of his complaint, Rich repeatedly refers to the actions or omissions of "staff" or "jail

staff" in describing the state actors responsible for the substandard living conditions he allegedly

endured after he was placed in a one-man cell with Neff.  Doc. 1, Compl., at 3-4.  As a result,

---

[4] The Court cites this unpublished decision for its persuasive value. *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

Rich's version of the facts does not support imposing personal liability against Karleskint for the conditions-of-confinement claim.

Relevant to the conditions-of-confinement claim, Rich's only reference to the actions of specific individuals shows that two non-defendant detention officers—Cody Thompson and Tyler Houston—rudely rebuffed Rich when he complained about his need for toilet paper. *See* Doc. 1, Compl., at 4. Rich appears to suggest, by adding Wynn's name in a parenthetical after Houston's name, that Wynn might be personally liable for this particular slight in his capacity as a supervisor over Thompson and Houston. Doc. 1, Compl., at 4. Nonetheless, Rich's passing reference to Wynn does not establish that, in his capacity as a defendant-supervisor, "(1) [Wynn] promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds*, 614 F.3d at 1199. Even assuming Thompson and Houston wrongfully deprived Rich of toilet paper, and that that deprivation alone was sufficient enough to implicate the Fourteenth Amendment, there is no evidentiary support for Rich's suggestion that Wynn knew about or otherwise condoned their violation of the Jail's policy which prohibits punishing inmates by depriving them of hygiene supplies. Doc. 44-15, Defs.' Ex. 15, at 1-6. Thus, even under Rich's version of the facts, Wynn cannot be liable, either personally or in his capacity as a supervisor, for the alleged Fourteenth Amendment violation.

Finally, Rich's own statements show that unidentified "jail staff" denied Rich's "daily" requests to speak to Sheriff Moore about the alleged civil rights violations and did not permit him to file formal grievances. Doc. 1, Compl., at 4. Under Rich's version of the facts, there is no evidence to support that Sheriff Moore was "aware of facts from which the inference could be drawn" that Rich faced "a substantial risk of serious harm," much less that he "dr[e]w the

inference." *Farmer*, 511 U.S. at 837.  Thus, like Wynn, Sheriff Moore cannot be liable, personally or in a supervisory capacity, for the allegedly inhumane and unconstitutional conditions.

Because Rich's version of the facts does not support that Sheriff Moore, Wynn or Karleskint violated his Fourteenth Amendment right to adequate shelter and clothing, all three defendants are entitled to summary judgment on the basis of qualified immunity as to the conditions-of-confinement claim asserted against each defendant in his individual capacity.

### 2.     Official-capacity claim

To the extent Rich intends to sue Sheriff Moore in his official capacity, the Court agrees with Moore that the record does not support an official-capacity claim.  To be sure, as the Delaware County Sheriff, Moore is the official responsible for promulgating and enforcing policies for the Delaware County Jail and operating the jail on a daily basis.  *See* OKLA. STAT. tit. 19, § 513; *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.*, 237 P.3d 134, 142 (Okla. 2010) ("Under Oklahoma law, the sheriff is the final policymaker for a county jail.  The sheriff, and not the board [of county commissioners], is responsible for medical care in Oklahoma.").  But, for two reasons, there is no evidence to support a *Monell* claim against Delaware County.

First, as just discussed, Rich's version of the facts does not show that Karleskint, Wynn or Sheriff Moore, as individual officers, violated Rich's Fourteenth Amendment right to adequate shelter and clothing, and all three defendants are thus entitled to qualified immunity as to that claim.  Without evidence that one of these officers committed a constitutional violation, Delaware County cannot be held liable.  *Jiron*, 392 F.3d at 419.

Second, even accepting as true that one or more unidentified members of the "jail staff" violated Rich's Fourteenth Amendment right to adequate shelter and clothing, none of the factual assertions in Rich's complaint suggest, much less demonstrate, that the alleged actions of those

21

unnamed individuals resulted from a policy, custom or practice promulgated or endorsed by Sheriff Moore.  Doc. 1, Compl., generally.  Rich identifies no specific facts in his complaint demonstrating "(1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation."  *Sanders v. Glanz*, 138 F. Supp. 3d 1248, 1254 (N.D. Okla. 2015).  Moreover, Sheriff Moore has submitted evidence that the actions alleged in the complaint would have violated the polices Moore did promulgate and enforce.  Docs. 44-11 through 44-15.

Because there is no evidentiary support for Rich's apparent claim that Sheriff Moore violated his constitutional right to adequate clothing and shelter, under a *Monell* theory of liability, Sheriff Moore is entitled to judgment as a matter of law as to the conditions-of-confinement claim asserted against him in his official capacity.

### B.        Denial-of-medical-care claim

In his seventh "sub-claim," Rich claims Defendants either delayed or denied his access to adequate medical care. Doc. 2, Pl.'s Br., at 10-11.  Under the Fourteenth Amendment, jail officials must provide adequate medical care for pretrial detainees.  *Rife*, 854 F.3d at 647.  A constitutional violation occurs when jail officials "are deliberately indifferent to a pretrial detainee's serious medical needs."  *Id.*  To state a plausible deliberate-indifference claim, a plaintiff must identify specific facts demonstrating (1) that his "medical need was objectively sufficiently serious," *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005), and (2) that "the defendant knew of an excessive risk to the plaintiff's health or safety and disregarded that risk, *Rife*, 854 F.3d at 647.

Taken as true, Rich's version of the facts show that he had a sufficiently serious medical need.  Specifically, he was diagnosed with an abscess that required medical intervention and antibiotics to treat the infection.  Doc. 44-7, Defs.' Ex. 7, at 1; Defs.' Ex. 7, at 1; Doc. 44-8, Defs.'

Ex. 8, at 1-3.  These facts satisfy the objective component of his deliberate-indifference claim.  *See Al-Turki v. Robinson*, 762 F.3d 1188, 1192-93 (10th Cir. 2014) ("A medical need is considered sufficiently serious . . . if the condition 'has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001))).  But, again, the evidence does not support the claimed constitutional violation.

To the extent Rich sues each defendant in his individual capacity, there is no evidence showing that Sheriff Moore, Wynn or Karleskint personally participated in the alleged deprivation of Rich's Fourteenth Amendment right to adequate medical care, much less that each defendant acted with the deliberate indifference necessary to establish a Fourteenth Amendment violation.  As previously stated, to impose personal liability against any individual defendant, Rich must provide evidence showing that the defendant personally participated in the alleged Fourteenth Amendment violation or that the defendant can be held liable in his supervisory capacity.  *Brown*, 662 F.3d at 1163.  And, in either situation, Rich must show that each defendant, subjectively, knew of and disregarded an excessive risk to his health or safety.  *Rife*, 854 F.3d at 647; *Arocho*, 367 F. App'x at 956.  With respect this claim, Rich's complaint refers generically to how "staff" responded to his need for medical care.  Doc. 1, Compl., at 4-5.  None of his factual assertions show that any of the named defendants delayed or denied his access to medical treatment.  *Id.*

More importantly, Rich's version of the facts, which suggests that his "plea[s]" for medical attention were ignored for several days, Doc. 1, Compl., at 4-5, is blatantly contradicted by the record.  The record shows that Rich noticed an infected lump in his arm pit on April 14, 2017, that he submitted a written request for medical treatment on April 17, 2017, and that he was transported to an urgent care center the next day, April 18, 2017, where he was treated and prescribed

antibiotics.  Doc. 1, Compl., at 4; Doc. 44-7, Defs.' Ex. 7, at 1; Defs.' Ex. 7, at 1; Doc. 44-8, Defs.'

Ex. 8, at 1-3.  The record further shows that Rich returned to the Jail with instructions to remove

one inch of packing in 24 hours, remove the remaining packing on the following Thursday, take

the medication as prescribed, and keep the area clean and covered.  Doc. 44-8, Defs.' Ex. 8, at 2-

3.  As directed, jail staff removed part of the packing on April 19, 2017, and the remainder of the

packing on April 20, 2017.  Doc. 44-7, Defs.' Ex. 7, at 1.  After Rich returned to the jail, his

medications were administered as prescribed.  Doc. 44-9, Defs.' Ex. 9, at 1-6.

On this record, Rich fails to show that Defendants, or anyone else at the Jail, violated his

Fourteenth Amendment right to adequate medical care.  Thus, all three defendants are entitled to

summary judgment on the basis of qualified immunity, to the extent they are sued in their

individual capacities, and Sheriff Moore is entitled to judgment as a matter of law, to the extent he

is sued in his official capacity.

### C.    Excessive-force claim

As a final matter, Rich appears to assert an excessive-force claim, against Karleskint, in

his individual capacity.[5]  The Fourteenth Amendment's due process clause governs Rich's claim

because he was a pretrial detainee at the time of the alleged use of excessive force.  *Kingsley v.*

*Hendrickson*, 576 U.S. 389, 396-97 (2015); *Porro*, 624 F.3d at 1326.  To establish a Fourteenth

Amendment violation, a pretrial detainee must show that "the force purposely or knowingly used

---

[5] As previously stated, it is not clear from the complaint or Rich's supporting brief that Rich intends to assert an excessive-force claim.  He clearly identifies seven "sub-claims" under his Fourteenth Amendment claim and excessive-force is not listed as a sub-claim.  Doc. 2, Pl.'s Br., at 6-11.  He does, however, include several facts in the complaint regarding his physical confrontation with Karleskint and he declares, under penalty of perjury, that Karleskint "physically assaulted" him.  Doc. 1, Compl., at 3; Doc. 2, Pl.'s Br., at 13.  Because Rich appears *pro se* the Court must liberally construe his complaint and, because Karleskint addresses a potential excessive-force claim in his motion for summary judgment, the Court will consider that claim out of an abundance of caution.

against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97.  In excessive-force cases "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Ultimately, several factors "bear on the reasonableness or unreasonableness of the force used," including, but not limited to: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*  In considering these factors, courts also "must take account of the legitimate interests in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate." *Id.* at 399-400.

Taken as true, Rich's factual assertions show that Rich and some of his cellmates became upset and disruptive when Officers Luper and Karleskint did not immediately honor a request for a mop to clean toilet water from the floor in cell # 7.  Doc. 1, Compl., at 3; Doc. 44-2, Defs.' Ex. 2, at 12, 16.  Rich and one or more of his cellmates began yelling obscenities at Luper and kicking the cell door.  Doc. 44-2, Defs.' Ex. 2, at 12-13, 16.  In response, Luper told Rich and his cellmates that they would be locked down for 24 hours as a sanction for disrespecting staff.  *Id.*

When Karleskint and Luper were finished with the tasks that prevented their immediate response, Karleskint opened the door to cell # 7, allowed the inmates to retrieve a mop, and allowed Rich to shower.  Doc. 44-2, Defs.' Ex. 2, at 12-13.  After the inmates finished cleaning the cell, Karleskint told them to lock down and they complied.  *Id.*  After Rich shut the cell door, he asked Karleskint if he and his cellmates would still be subject to the 24-hour lock down.  *Id.*  Karleskint said that would be Luper's decision.  Doc. 44-2, Defs.' Ex. 2, at 13.  When Luper later confirmed

that Rich and his cellmates would be on 24-hour lock down, Rich threatened to "turn up" the Jail and told them to open the cell door so he could demonstrate the meaning of "turn up." Doc. 44-2, Defs.' Ex. 2, at 13.

Over the intercom, Karleskint encouraged Rich to calm down and, when those efforts failed, Karleskint and Luper decided to speak to Rich in person. Doc. 44-2, Defs.' Ex. 2, at 13. Karleskint drew his X2 Taser as he waited for the cell door to open. *Id.* at 14. When the door opened, Karleskint saw Rich standing toward the back of the cell with an angry look on his face and his arms crossed. *Id.*; Doc. 44-3, Defs.' Ex. 3, at 5. After pointing the Taser at Rich, Karleskint holstered the Taser and urged Rich to "let it go," Doc. 1, Compl, at 3; Doc. 44-2, Defs.' Ex. 2, at 14. Using crude terms, Rich refused to do so unless the officers agreed to remove the sanction of a 24-hour lock down. Doc. 44-2, Defs.' Ex. 2, at 14.

At that point, Karleskint tried to grab Rich and remove him from the cell. Doc. 1, Compl., at 3; Doc. 44-2, Defs.' Ex. 2, at 14, 16. Rich responded by punching Karleskint in the face, and Karleskint tackled Rich. Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex. 3, at 5. When Luper attempted to assist Karleskint, a second inmate "jumped on" Luper and began punching Luper in the head. Doc. 44-2, Defs.' Ex. 2, at 14, 17. Karleskint got up, shoved Rich to the back of the cell, and reached for his Taser to assist Luper. *Id.* But Karleskint no longer had the Taser because Rich had taken it from him. Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex. 3, at 3. Rich then pointed the Taser at Karleskint and threatened to shoot him in the face. Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex. 3, at 3. As Rich and Karleskint fought for control of the Taser, a third inmate intervened and returned the Taser to Karleskint. Doc. 44-2, Defs.' Ex. 2, at 14; Doc. 44-3, Defs.' Ex. 3, at 3. By that time, Neff was no longer fighting with Luper, and Rich had apparently conceded the fight. Doc. 1, Compl., at 3; Doc. 44-2, Defs.' Ex. 2, at 14.

Applying the factors identified in *Kingsley* to these particular facts, the Court finds it was objectively reasonable for Karleskint to use some amount of force against Rich after Rich struck him in the face. And, to the extent Karleskint maintained possession of the Taser, he showed significant restraint in not using it against Rich.   Moreover, the "security problem at issue" involved two of five inmates in one jail cell assaulting the only two male detention officers who were on duty. *Kingsley*, 576 U.S. at 397.  This issue was sufficiently serious for the third detention officer, who observed the altercation from the Jail's command center, to call local law enforcement officers for assistance.  Doc. 44-2, Defs.' Ex. 2, at 14, 17.  And it appears that the only individual who sustained an injury requiring treatment was Officer Luper, not Rich.  *Id.* at 14, 18.  Giving due consideration to the detention officers' legitimate interests in maintain order at the Jail, Karleskint's use of force under these particular circumstances was not objectively unreasonable.

Because Rich's version of the facts fails to show that Karleskint violated his Fourteenth Amendment right to be free from the use of excessive force, Karleskint is entitled to summary judgment on the basis of qualified immunity as to the excessive-force claim asserted against him in his individual-capacity.

**V.      Conclusion**

For the reasons stated in the foregoing analysis, the Court finds that the record does not support Rich's claims.  The Court therefore grants Defendants' motions for summary judgment.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.  Rich's motion for stay (Doc. 51) is **denied**.

2.  Rich's motion for extension of time (Doc. 54) is **denied**.

3.  Defendants' motion for confession of judgment (Doc. 48) is **denied**.

4.  Moore's motion for summary judgment (Doc. 44) is **granted**.

5. Wynn's and Karleskint's joint motion for summary judgment (Doc. 45) is **granted**.

6. Rich's renewed requests for appointment of counsel (Docs. 51, 54) are **denied**.

7. This is a final order terminating this action as to all claims and all parties.

ORDERED this 29th day of October, 2020.

JOHN E. DOWDELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

28